THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* NATHANIEL GADDY, (Impleaded), Defendant-Appellant.

(No. 54636;

First District—October 1, 1971.

Gerald W. Getty, Public Defender, of Chicago, (Michael Weininger, Ronald P. Katz, and James J. Doherty, of Defender Project, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle, and Brent F. Carlson, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Nathaniel Gaddy and Robert Woods were charged with the murder of Robert Hughes, Jr. In a bench trial, defendant Gaddy was found guilty and defendant Woods not guilty. The court sentenced defendant Gaddy to a term of forty (40) to fifty (50) years. On appeal defendant contends: (1) the prosecution failed to prove defendant guilty beyond a reasonable doubt; (2) there was no probable cause for defendant's initial detention and questioning and, therefore, the court erred by admitting into evidence statements made by defendant during this period; (3) the court erred by admitting into evidence oral statements made by defendant following his arrest; (4) the sentence was excessive.

Michael N. Smith testified for the State that on October 18, 1968, at

approximately 8:45 P.M. he was in front of Spencer School, 214 N. Lavergne, with Robert Hughes, Jr. when some shots were fired. He dropped to the ground, and while on the ground he looked across the street and observed defendant Gaddy with a rifle. He not only could identify Gaddy by his clothing and characteristic green hat, but he could even see defendant's forehead. Defendant Woods and one Charles Williams were with Gaddy. Smith knew defendants Gaddy and Woods prior to this incident. After the shots were fired, Smith noticed other people fall to the ground. Closest to him were Howard Fort and Calvin Stennis. Robert Hughes was also on the ground. Immediately thereafter all ran into the school where Smith observed the injured Hughes run upstairs and onto the fire escape. Approximately fifteen (15) minutes later the police arrived. Later that evening Smith gave a statement to the police at the Austin District Police Station. On the night in question Smith had in his possession a .45 automatic pistol. He also testified that on one occasion prior to the incident, while walking in an alley behind Gaddy's house, he observed defendant cleaning a rifle.

Charles Williams, originally indicted as a co-defendant in the case, but subsequently discharged, testified for the State that on October 18, 1968, at about 9:00 P.M. he looked out of the school entrance window and saw flashes come from a gangway across the street. He recognized defendant Gaddy as the individual who fired the fatal shot by the green hat defendant characteristically wore and which the gunman was then wearing. Earlier that evening he had been with Gaddy and, therefore, could recognize defendant by his clothing. Williams ran from the school after the shooting and saw Gaddy and two companions, Robert Woods and Wilbur Lee run from the alley behind the gangway from where the shots were fired. Williams was reluctant to give police his statement, and at trial, at the request of the State, he was declared a court's witness.

Officer Claude Erwin, who arrived at the school shortly after the shooting occurred, testified for the State that on the night in question the lighting conditions in the area were fair.

Catherine McKinney, landlady of defendant Gaddy, testified for the State that on October 18, 1968, at about 5:30 P.M. her dog was shot in the backyard of the building in which defendant lived. She had had an argument with defendant no more than a week prior to this incident. Defendant stipulated that the bullets removed from the dog and from the deceased Robert Hughes were from the same .22 caliber rifle. On occasions previous to October 18, she had seen defendant Gaddy wearing a green hat, but she did not remember if he wore it that evening.

Calvin Stennis testified for the State that on October 18, 1968, approximately thirty (30) minutes before the shooting occurred, he saw a boy

who was wearing an army jacket standing on the curb in front of Spencer School. That boy might have been Michael Smith. When the shooting occurred Stennis was with Hughes on the school steps; he did not notice where the boy in the army jacket was standing. Howard Fort was inside at the school dance at the time.

Detective Lanners testified for the State that he arrived at Spencer School on October 18, 1968, at about 10:45 P.M. The school floodlights were on and the lighting conditions were very good. He received a description of the offenders from Detective Rooney who was already on the scene interviewing witnesses. Other police officers were also present. Later that evening at 15th District Police Station, Lanners interviewed several witnesses. That evening police questioned defendant Gaddy but he was released. On October 22, 1968, Detective Lanners, after receiving a description of defendant Gaddy from Michael Smith, arrested Gaddy and advised him of his rights. After being advised, defendant denied being present at the scene of the murder. On December 2, 1968, Lanners saw defendant at Cook County Morgue, at which time defendant threatened him. On January 15, 1969, Lanners was present in Branch 43 (Judge Epton's Courtroom) when defendant Gaddy, defendant Woods and Charles Norris were called.

Charles Norris testified for the State that in February of 1969, in Judge Epton's Court (Branch 43), he had a conversation with defendant Gaddy, wherein defendant admitted killing Robert Hughes.

Frank Hundrieser testified for the defense that area photographs presented by defense were authentic, and truly represented the lighting conditions of the area as of the night they were taken, April 27, 1969. He believed the State photographer achieved a lighter effect by using a flashgun when he took his photographs.

Ernest Harris testified for the defense that on October 18, 1968, he saw defendant Gaddy at 7:00 P.M. and 10:00 P.M. Between that time Harris was in a pool room located at Cicero and Maypole with Michael Horn, Wilbur Lewis, Jeffrey Johnson and defendant Woods. Woods never left the poolroom during this period. Also, during this period Michael Horn had in his possession defendant Gaddy's green hat. At approximately 10:00 P.M. Gaddy came into the poolroom.

Wilbur Lewis testified for the defense and confirmed Harris' testimony.

Ledora McDonald testified for the defense that on October 18, at about 9:15 P.M. she was with defendant Gaddy when she heard a shot. However, on cross-examination she testified that she thought the shot occurred after she had talked to defendant. Also, on both direct examination and cross-examination she testified that she was on the east side

of Lavargne (across the street from Spencer School) when she heard the shot. However, on redirect examination she faltered even as to this point.

"Q. Were you on the east side of Lavergne at that time (of the shooting)?

A. Yes.
I said I don't know exactly where I was standing when I heard this noise.

Q. Were you on the school side or the other side of the street when you heard this noise?

A. I don't know.

Q. You don't know?

A. No."

Mrs. Martha Gaddy, mother of defendant Nathaniel Gaddy, testified that she did not know what defendant did between the hours of 8:00 P.M., when defendant left home, and 11:00 P.M., when he returned.

Percy Gaddy, brother of defendant, testified that he was at defendant's house at approximately 8:30 P.M. when defendant left. He did not see defendant again until 9:30 P.M. when he left defendant's house and found defendant waiting in his car. They drove to Percy's home and arrived at approximately 10:00 P.M. They left shortly thereafter and drove to a pool hall at 15th and Pulaski where they arrived at approximately 10:20 P.M. Defendant did not enter the pool hall. They left the pool hall and drove around Maywood until midnight but made no other stops.

Bobby Harris testified for the defense that on October 18, 1968, at approximately 9:00 P.M. he was leaving Spencer School when two shots were fired. The blaze from the shots wounded his sister. The shots came from a gangway across the street. However, he did not see anyone in the gangway. He did see defendant Gaddy and Miss McDonald standing on the corner. Gaddy was not wearing a hat. Harris did not remember seeing Michael Smith present at the time of the shooting.

Robert Woods testified in his own behalf that he was at the poolroom at Cicero and Maypole from 7:30 P.M. to 10:00 P.M. During this period one Michael Horn had in his possession Gaddy's green hat. Gaddy came to the poolroom at approximately 10:00 P.M.

Howard Fort testified for the defense that he was inside at the dance when the shooting occurred. He did not remember seeing Michael Smith that evening.

Nathaniel Gaddy testified in his own behalf that on October 18, 1968, at approximately 7:00 P.M. he was on the corner of Lavergne and Maypole with Sonny Harris, Wilbur Lewis, Jeffrey Johnson, Robert Woods and Michael Horn. Initially, he was wearing a green hat, but

during "horseplay" it fell off, and when he left the corner at approximately 7:30 P.M. he no longer had the hat in his possession. At about 9:00 P.M. he was with "Pumpkin" (Miss McDonald) on the corner of Lavergne and Maypole when he heard shots. After the police arrived, he left "Pumpkin" and went home where he noticed Percy's car. He left with Percy, but they did not drive directly to Percy's house. They went to the poolroom on Cicero and Maypole first. They arrived at Percy's house at approximately 10:20 P.M., not at 10:00 P.M. as Percy had testified. In later testimony, defendant charged the time of arrival to 10:40 P.M. On cross-examination defendant's statement of October 20, 1968, was used to impeach his testimony. In that statement defendant stated that (1) on October 18, 1968, at about 7:00 P.M. he was with "Pumpkin" on the corner of Lavergne and Maypole; (2) he was not at Spencer School at 9:00 P.M., but rather he was at home arguing with his mother's landlord; (3) he went to his brother's house at 9:10 or 9:15 P.M. Defendant testified that the police first came to his house at about 1:00 or 2:00 A.M., Saturday, October 19.

*Opinion*

■■ (1) Defendant first maintains that he was not proved guilty beyond a reasonable doubt. After considering the testimony, we believe this contention is without merit. The State presented Michael Smith who identified defendant Gaddy as having a rifle in his hands immediately after the shots were fired, and across the street in the area from which the shots had come. His observations were corroborated by the testimony of Charles Williams and by defendant's admission made to Charles Norris. Additionally, both Williams and Smith were sure that the boy firing the rifle wore a green hat similar to the one commonly worn by defendant, and which defendant had in his possession at the time of his arrest. In an attempt to support his claim of innocence, defendant Gaddy testified that he was with Ledora McDonald on the corner of Lavergne and Maypole when the shooting occurred. However, his testimony was impeached by his statement of October 20, which he gave to police during a period of questioning prior to his arrest. Ledora McDonald testified as an alibi witness, but her testimony was confused and self-contradictory. Wilbur Lewis and Ernest Harris testified for the defense that on October 18, at approximately 10:00 P.M. they saw defendant Gaddy in a poolroom on Cicero and Maypole. However, Percy Gaddy, defendant's brother, testified that he and defendant were at Percy's house at 10:00 P.M., not at the pool hall. The trial judge believed the testimony of the State's witnesses, and their testimony, if believed, was sufficient to establish guilt beyond a reasonable doubt. Where a cause is tried without a jury the law commits to the trial judge

the determination of the credibility of the witnesses and the weight to be given to their testimony, and where the evidence is merely conflicting the reviewing court will not substitute its judgment for that of the trial court. (*People v. Dillon* (1962), 24 Ill.2d 122 at 127.) As was said in *People v. Novotny* (1968), 41 Ill.2d 401 at 411-412:

"When the trier of facts renders a decision based upon credible and substantial evidence which is sufficient to convict, that verdict is not subject to question on review merely because the judge or jury chose to believe the consistent testimony presented by the State. (citations omitted)." It is neither the duty nor the privilege of a reviewing court to substitute its judgment as to the weight of disputed evidence or the credibility of witnesses for that of the trier of fact who heard the evidence presented and observed the demeanor of the witnesses; (citations omitted) and we will not reverse a criminal conviction where the evidence is not so improbable as to raise a reasonable doubt of guilt. [citations omitted.]"

(2) Defendant's second and third contentions concern the admission of the following evidence at trial: (1) a written statement defendant made prior to his arrest and which the State introduced to impeach defendant's in court testimony; (2) an oral statement defendant made while in custody and subsequent to being advised of his rights in conformity with the requirements of *Miranda v. Arizona* (1966), 384 U.S. 436, and which the State used in its case in chief. As to the written statement, defendant contends that there was no probable cause for his initial questioning and detention and, therefore, the court erred in admitting into evidence the statement made during this period. As to the oral statement, defendant contends that since he did not make a statement that he fully understood and voluntarily waived his rights after admittedly receiving the appropriate warnings, his subsequent answers were automatically rendered inadmissible.

■■■ Admissions or confessions may be challenged either by preliminary hearing on a motion to suppress or by appropriate objection made at trial. However, not once during the course of the proceedings did defendant raise the point that either of these statements was improperly admitted. The failure to make a proper and timely objection to the admission of evidence, or to move to strike it out after its admission, constitutes a waiver of the right to argue these points on appeal. See *People v. Trefonas* (1956), 9 Ill.2d 92 at 98 and *People v. Payton* (1970), 124 Ill.App.2d 78 at 88-90.

■■ (3) Defendant lastly contends that forty (40) to fifty (50) years imprisonment is excessive. After the court rendered its decision a lengthy hearing on aggravation and mitigation was held wherein the following

was established: defendant had been found guilty of crimes of a violent nature, battery and assault, within two years prior to the murder charge; defendant had served thirty days in the House of Correction for auto theft; defendant had been convicted of disorderly conduct; defendant had previously violated probation; defendant was on probation at the time he murdered Robert Hughes. In light of the aforementioned facts, it cannot be said that the penalty is at variance with the purpose and spirit of the law, or that it is in excess of the proscriptions found in the Illinois Constitution. (*People v. Taylor* (1965), 33 Ill.2d 417; *People v. Miller* (1965), 33 Ill.2d 439.) Because the sentence is within the limits set by the legislature [1] and meets the standard set by the Supreme Court we find no reason to reduce it.

The judgment is affirmed.

Judgment affirmed.

ENGLISH, P. J., and DRUCKER, J., concur.

---

[1] Ill. Rev. Stat. 1967, ch. 38, par. 9—1(b). MURDER.

"(b) Penalty.

A person convicted of murder shall be punished by death or imprisonment in the penitentiary for any indeterminate term with a minimum of not less than 14 years. If the accused is found guilty by a jury, a sentence of death shall not be imposed by the court unless the jury's verdict so provides in accordance with section 1—7(c)(1) of this Code."